Let's call the case, which is 20-1069 Throupe v. University of Denver, and for the appellant is Mr. Smith. You may proceed. Thank you, Your Honor. May it please the Court, Nathaniel Smith for Plaintiff Appellant Ronald Throupe. I'd like to try and reserve a few minutes, maybe three to five minutes for rebuttal if that's appropriate, and I'd like to just jump right into what I think is the real crux of this case. The question really is, can a university like DU manage and enforce expectations regarding the roles and relationships between faculty and students? And I think it's a general proposition. The answer to that is obviously yes. But the issue that comes up in this case is, can a university be permitted, as DU argues here, to establish and enforce expectations regarding faculty and student roles when the expectations that are being enforced collide with this notion that's also well-settled in the law, which is that you cannot use sex or gender or sex stereotypes in the way an employer handles its employees. And so I think that while generally you would want a university such as DU to be able to manage teacher-student roles, once gender becomes part of their factor or part of their consideration, I think at that point they cross the Title VII, Title IX line, and they're actually establishing liability by acting that way. Is there any reason to think that DU would have acted differently if this had been a female professor with a male student? I think that's precisely, Your Honor, the argument that there's no doubt in my mind that what was going on here was that it was a male professor and a female student. In fact, Barbara Jackson said so much. She said that the reason why—this is at page 679 of the record—question, this is a troop supervisor, why did you feel that the concerns that were reported to you fell under Title VII, I mean, Title IX? Answer, I think because, again, it's a male faculty member, it's a female student. And so what I think's going on here— Let me pause. Chief Justice Judge Timkovich, that doesn't help, that statement simply says it's because of opposite genders, a male and a female. That is not inconsistent or hostile to a similar statement that might have been made if the facts had warranted it, if it were a female supervisor and a male. This doesn't say anything other than it says one's a male and one's a female. This is not, to me, a statement that it's because this person was a male. If we were just talking about idle gossip about a relationship, then I would agree with the court, but we're not talking about that. What happened here was that there were perceptions that there was a quote-unquote inappropriate relationship, a sexual relationship, between this faculty member and this student. In fact, there was none, but nevertheless, driven by those perceptions, the faculty member was accused by a supervisor falsely of stalking and being obsessed and having a perverted relationship with this student. As a result of those allegations, he was investigated. The university looked into this and found no basis whatsoever for the conclusion or the allegation that there was any kind of romantic or sexual relationship at all. Nevertheless, they pursued to discipline him, and they issued a warning letter to him, which is in the record, basically saying that because of perceptions about your role with this student, even though there's no basis for it, we are warning you that if you continue to act in a way which is inconsistent with what we think is appropriate, without ever explaining that, you are under threat of termination for cause. Well, how do you get around all the allegations that Dr. Throop made that the motivation here was to force him to resign so they could get rid of the real estate department? Well, I think that- What do we do with those? Those are specific allegations by your client. I think my client was making statements that there were many reasons why Barbara Jackson, his supervisor, wanted to get rid of him. And frankly, people do things for many, many different reasons. Some of them are consistent. Some of them are logical. Some of them are illogical. But where did you, in the lower court, specifically say you were asserting a mixed motive claim? No, no. Where does the term mixed motive ever appear, if we search that phrase? I think it probably first appears in my brief, because what I was saying was- At the appellate level? Yes, Your Honor. And which brief? The opening brief. Yeah. In challenging the decision by the lower court, saying that the only intent here was to remove Professor Throop for academic differences, I was saying that that was an error. And my point was that even in a mixed motive case, the courts recognized that employers act for many different reasons. And the point here is that- And where did you make that statement in your briefs on appeal? Was it a heading? Was it a headed? No, this is a mixed motive claim. A heading and then a discussion. Was it in the text or was it in a footnote? Your Honor, I wasn't saying it was a mixed motive- Can you answer the question? You said that term mixed motive. Which of those three options describes where you raised the issue on appeal for the first time? It was certainly in the text, Your Honor. Was it a heading? Did you have a heading mixed motive or- I think it's in point three. The lower court aired when it held that defendant Jackson's actions were not motivated only by a dispute over academic direction of the department, not biased or stereotypical thinking. And it's in developing that argument that I was saying that even in a mixed motive case- I wasn't saying this was a mixed motive case. I was saying even in a mixed motive case, the courts recognize that actors can have different motivations that are conflicting or dual or many. The Bostack decision by Judge Gorsuch makes this very, very clear. That once an impermissible factor becomes a motivating factor, liability is established. And the motivating factor issue is an affirmative defense by the defendant, which would then- the burden would be on the defendant to say, even if that's true, the same action would have been taken because of this other overriding motive. Mr. Smith, can I ask you to follow up on Judge Avell's question? In district court, when you responded to the defendant's motion for summary judgment, the way I read your brief, and I'm going to give you a chance to tell me how I've misread it, I may have, is that Ms. Jackson specifically wanted to get rid of the real estate segment of the Burns School and that she had concocted, contrived, these false reasons to get rid of Mr. Thrope. She contrived these rumors about his dalliance with this young woman and the like. But I didn't see anything that there was a dual motive. I thought that the way I read it was that that was the only motive, and that the sexual allegations were simply concoctions to further that illicit motive. Have I misread your brief in district court? Um, I think that misread is probably too strong a word, Your Honor. I think that what was going on was that the lower court counsel was trying to provide a chronology of events from Professor Thrope's perspective. And what happened was, as soon as Barbara Jackson became the supervisor in the department, and this was in 2013, she sat down several of the professors and said, I want to get rid of all you real estate guys, and I want to put in construction people. And there was no major attack on Professor Thrope relating to that. What happened was, over the course of the next two years, there were widely circulated rumors, and that's also spelled out in the briefing below, of a sexual relationship. And those rumors come to a head in May of 2015, when Barbara Jackson accuses Thrope of stalking this other student, having an obsessive and a perverted relationship with her, demanding a critical incident investigation of her. And this is in an email that's also in the record. And so what happened was, I think there was an attempt to describe that initially, it was, okay, I'm going after your head. But then, as in life, things evolved and things developed. And I think it's an unfair characterization to say that Professor Thrope, in the lower court proceedings, said that the only reason why Barbara Jackson was acting towards him was because of an academic dispute. And he certainly never said that the only reason why DU was acting was because of a academic dispute. So I think that answers the question to the best of my ability. I see I'm running short on time. I would just like to make out one point, and then I'll sit down and wait for an opportunity to rebut. The other big issue here is, this is not just idle gossip at a water cooler about who's sleeping with whom. It may have started that way. And there's plenty of evidence in the record that for two years, that kind of unfortunate nastiness was going on. But this problem and this case really took off when Professor Thrope was falsely accused based on perceptions, not fact, of having an obsessive, perverted relationship. And that launched this investigation, leading to his reprimand and threat. But wasn't the concern that it was a student-teacher relationship? Wasn't that the main thing that they said was inappropriate? Well, I think that's how, Your Honor, they're trying to splice it today. They're trying to say that that's the way they spliced it then, too. Well, I didn't see any statement below that we're investigating this because men should not have these kinds of relationships with women. It was that a professor should not have this kind of relationship with a student. Yes, but what they were saying was that he's too emotionally connected with her and that it's a male faculty member and a female student. Well, that's the facts. That was the facts. But that wasn't the statement that what it seemed to me their concern was the faculty relationship. Well, I think that there's a question of facts here as to whether or not they would have treated Professor Thrope the same had he been a woman. Because what was going on was he had a very close working relationship and a personal relationship with this student. And he was at times very close with her emotionally. And I think that the perception was that a man cannot be emotionally connected unless he's having a sexual relationship with a younger woman. Well, can I ask you, I mean, you've mentioned several times that you said that Miss Jackson accused him of a perverted, obsessive relationship and that these were all simply stereotypes. Wasn't it Mr. Thrope's acknowledged testimony that he said that this young lady is wacky when she's on her period? Wasn't it Mr. Thrope's acknowledgement that he had was concerned that she wasn't returning his phone calls and that he would go to the coffee shop where she frequented, hoping that she would be there? I mean, if you know, isn't it pure naivete to say that? Wasn't it his statement to the young lady about why he should get reimbursed for her ticket that she was his significant other? If I have a subordinate of the opposite gender and I describe that person as my significant other, if I say these wild things about her, I mean, it would be sort of outlandish under title IX for Miss Jackson not to have initiated some sort of investigation, wouldn't it? I see my time has expired. May I respond? Go ahead and respond, yeah. Thank you. Absolutely, Your Honor. DU unequivocally had an obligation to investigate these concerns, and they did. And repeatedly, what they were told was there was no basis for that. And in fact, they made that determination, the EU people investigated this and found no basis at all for the suggestion that there was some sort of inappropriate relationship. And nevertheless, management decided to take up the mantle and threaten Professor Thrope's job based on perceptions only. And that's in the written memo that they issued to him. They acknowledge no sex going on here, but perceptions are what's making us concerned. That is liability for stereotyping because there's no basis for the underlying concern, which Your Honor is absolutely correct. Of course, the university has an obligation to look into that. Undoubtedly, I would never suggest such a silly idea that they wouldn't. Oddly, DU also had an obligation to investigate Professor Thrope's concerns that he was being DU didn't do any investigation. And there's no dispute about that. I'm very glad that you're asking that question. Thank you. Thank you, Mr. Smith. Let's turn over to the university. Mr. Goh. Yes. Good morning. May it please the court. Jim Goh on behalf of the Appalachian University of Denver and the individual defendants. Mr. Smith spent a bit of time talking about his view of what this case is about. I want to start by pointing out what this case is not about. This is not a case about a campaign of salacious rumors directed at a member of a particular gender. It's not even a case about a campaign of rumor mongering. When asked, Mr. Thrope could only point to a few instances in which his colleagues, both the record is clear that when he was asked, did you ever hear anyone say point blank that Thrope and Shui Mao were having an affair or words to that effect? His answer was, well, literally, no. And then he changes his response to say, yes, Glenn Mueller saying those words to me that night and Mike Crane joking to me about it. Those communications were all directed to him in a private setting. It is not a widespread dissemination of salacious rumors. And I have a question that probably isn't as positive, so don't take much time on it. But when everybody is talking about whether it is discrimination based upon sex, they seem to talk about the based upon meaning motivation, what motivated her. Could we have a based upon sex claim that is not motivated by gender discrimination, but motivated by something quite innocent of that, for example, a motivation of trying to get rid of the real estate people? But the means, not the motivation, but the means for accomplishing a non-discriminatory motive is to use sexual weapons. Would that state a claim under Title IX, in your opinion? It would not, Your Honor, because the law is very clear that any discrimination in this context has to be based on gender, based on sex. But the word based is my question. If I have an innocent motivation, but I choose to weaponize sex to accomplish that non-sexual motivation, would that be on the basis of sex? Or is it on the basis of limit, only a focus to motivation and not to the means used? If gender were used as a means to an end, but the end itself was non-sex, then I would submit that that is not an instance of discrimination. Everybody assumes that, the case law assumes that, and that's why I'm not wanting to take any more time on it. But when I read the words on the basis of sex, I think that there's at least a potential ambiguity that it may not be as narrow as simply motivation. It could include the mechanisms or the weaponry used to accomplish it. But that was my only question. If you had any clear law that addressed that possible distinction, and I take it your answer is no, and that it wasn't argued or raised below, and so let's just move on. That is not your honor, but I think this is a good segue to talk about the Bostock Supreme Court case. This was the case that was handed down about seven months ago. And Mrs. Smith and I don't agree on many things, but we do agree that Bostock is relevant and instructive to this case. Bostock dealt with employees' anti-gay policies and practices. And the Supreme Court essentially held that if an employer were to fire a woman for being a homosexual and also fire a male, a man for being a homosexual, that doesn't neutralize the discrimination. You're just doubling down on the discrimination. And the Supreme Court in Bostock established a litmus test for sex discrimination, which I think may be germane to your question, Judge Ebel. And the language of the Supreme Court is, quote, if changing the employee's sex would have yielded a different result, that's sex discrimination. In other words, according to the Supreme Court, if, quote, the employer discriminates against a male for traits or actions it tolerates in its female colleagues, that's sex discrimination. So based on Bostock, the central question here is, do you have tolerated the same conduct in a female professor? And on that, we have no evidence in this case. Well, there was a statement by Ms. Jackson that she thought a male-female friendship, I think she deemed it as friends with benefits, which suggests that she might view a male professor's relationship differently than a female professor's relationship. I don't read it that way, Your Honor. In fact, it's quite clear. The record is quite clear that the university officials were up in arms because of the asymmetrical power structure between a professor and a student. In this case, the professor happens to be male and the student happens to be female. And we don't need to go any further than Lisa Throop's own response brief in the Assembly Judgment Briefing. And I think it's important to highlight the language that they presented to the District Court as to the intent of the defendants. And I quote, When defendant Jackson arrived as chair, she announced her intention of significantly reducing the real estate portion of the school, which would require firing at least five real estate professors. Throop was one such professor. From that ensued a campaign to make Throop leave. Individual defendants began spreading rumors. And he goes on to recount rumors about his job performance, and in particular rumors about the alleged extramarital affair. His own brief makes clear that any discrimination was not based on his gender, but based on his status as a real estate professor caught up in some campaign by the department chair to diminish the role and influence of the real estate segment of the curriculum. And again, you know, what's telling is we go back to the record in terms of Lisa Throop's own belief and the evidence that he has about gender discrimination. When he was asked whether he believed he was subjected to gender discrimination, this is what he testified to in his deposition. Do you view this as DU trying to discriminate against you on the basis of your gender? Answer, my gender? I don't know. And he was also asked whether he thought DU was trying to mistreat him because of his gender. Answer, I don't know. And there's more to that, where Throop could not even say that defendants took action, at least in part, based on his gender. And with respect to the rumors, the district court held that mere office gossip and rumors about a sexual relationship without more are not necessarily because of sex. Here we have both man and woman who were targeted, who were subjected to those rumors. Both Mao and Lisa Throop were subjected to those rumors, and the rumor mongers were both male and female. There's no evidence that Lisa Throop was singled out and targeted because of his gender. And perhaps more importantly. So can I ask you, is there a possibility that in a particular situation, that if a supervisor initiates rumors, sparks rumors, that a male professor is obsessed with a female student, is stalking her. Now that would implicate him and not her, wouldn't it? And wouldn't, and you all refer to the Pascua case, but at some point, could there not be a reasonable inference that a supervisor has, to use Judge Abell's excellent phrase, weaponized sex, in order to initiate a campaign to derail the, you know, a male supervisor by sparking these rumors? I believe that it is uncommon, but it is possible. It will depend on the nature of the rumors and who was targeted. Is this something where someone of a particular gender was singled out, as opposed to the other one? We have cases cited in the brief about comments of, usually comments directed at a woman, quote, unquote, sleeping her way to the top. Now, comments like that would typically not be associated with a man, and I agree with the honor that is possible. But those facts are not present here in this case. On the issue of gender stereotyping, now, of course, on appeal for the first time, Mr. Pru raises this argument. It was never presented to the district court. But looking at the merits, there is no evidence of gender stereotyping. All we have is there was a male professor rumored to have been involved in a sexual relationship with a female student. End of story. And according to his approval, that's enough to get him to a jury. So they do have that one statement about men want relationships with benefits. One statement by one person who was on the collective committee that made the management decisions as to Mr. Thoreau. So what we would have to say is that one statement was either insufficient to go forward to a jury, or we would have to say that that statement was itself not a discriminatory sex-based statement. It was simply using the words male and female in the context that that was the facts before them. And it wasn't a representation of any kind of a stereotype theory in general. I think both of those are potential responses, but I guess I don't know how you're going to play that. Well, my reading of it is that this was just incidental identification of who was who. But I think it's important to focus on what decisions were being made. Even assuming that Barbara Jackson had made comments indicative of a gender bias on this one particular occasion, this stray comment, what did she do in terms of her actions against Mr. Throop? Obviously, she did not start the rumors. I mean, Mr. Throop himself said that, you know, that began a while earlier from what he believed were a group of Chinese students. And I guess, you know, equally important is that Mr. Throop himself, by his own actions, actually prompted the speculation and the idle chatter, as Judge Joe Radcliffe pointed out. But what exactly did Barbara Jackson do, you know, with or without any so-called animus based on one particular comment? She raised concerns to the Office of Equal Opportunity, which resulted or culminated in an investigation. But that investigation was actually precipitated by Mr. Throop himself, because he went to the student and said that, you know, she had stopped attending his classes and was only selectively responding to him. And then he raised this litany of concerns, such as, you know, he disclosed facts that were very unusual, which prompted the investigation, such as, you know, he was paying, helping her pay her tuition. He was employing her outside of DU. He put her on the family cell phone plan. They would go on business trips together, and he would reserve a day for making memories with her. He was upset that she found a boyfriend through one of his social events. And then, of course, there was that menstrual cycle comment, all of which were concerning. DU was concerned that they were dealing with a student in distress and therefore launched an investigation. But what is important there is that at the end of that process, there was no adverse finding against Mr. Throop. There was no adverse action taken against Mr. Throop. And as an aside, I'll also point out that the investigation happened in May of 2015, as Mr. Smith pointed out. That's outside the two-year statute of limitations for Title IX. And does that get picked up, though, because it's all part of one concerted activity? There is no allegation here, no argument made of any kind of continuing violation. In fact, in the response brief in the summary judgment process, Mr. Throop admitted that these were new episodes, new incidents. And not only is that the investigation issue outside of this limitations period, perhaps more important is that there is no evidence that a similarly situated female professor would have had a full-blown investigation that he didn't have. There's just no evidence of that. There's no evidence creating any kind of inference as to why the investigation was not launched. I see that I'm out of time. Thank you, counsel. We appreciate your arguments. Counsel are excused and the case shall be submitted.